## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

MORRIE TOBIN, MILAN PATEL,
MATTHEW LEDVINA, DANIEL
LACHER, BRIAN QUINN, AND DAVID
SKRILOFF,

Defendants.

Civil Action No. 18-CV-12451
(NMG)

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the

following against Defendants Morrie Tobin ("Tobin"), Milan Patel ("Patel"), Matthew Ledvina

("Ledvina"), Daniel Lacher ("Lacher"), Brian Quinn ("Quinn"), and David Skriloff ("Skriloff"):

## SUMMARY

1.      This is a securities fraud enforcement action.  The defendants engaged in a

deceptive scheme to sell publicly traded stock to investors.  Tobin secretly controlled and owned

substantially all of the stock in two public companies:  Environmental Packaging Technologies

Holdings, Inc. ("Environmental Packaging") and CURE Pharmaceutical Holding Corp.

("CURE").  From approximately June 2013 to the present (the "Relevant Period"), the

defendants defrauded investors by concealing Tobin's control of these companies, enabling

Tobin to sell his shares: (a) without registering the offers or sales of stock with the Commission;

(b) without disclosing accurate information about Tobin's ownership and control over the

companies; and (c) without complying with legal limitations on sales of stock by company

"affiliates" such as Tobin.  As a result of the defendants' scheme, what appeared to be ordinary

trading by unaffiliated investors was actually a massive dump of shares by a company insider and his team seeking to profit at the expense of defrauded investors.

2.      A company is considered "public" when its securities trade on public markets, which carries with it legal requirements, such as obligations to disclose certain business and financial information regularly to the public.  Investors in certain public companies are required to disclose publicly any ownership interest in excess of 5% of the company's stock.  As part of the scheme, Tobin, Patel, Ledvina, and Lacher disguised Tobin's ownership to make it appear that his shares were owned by multiple unaffiliated entities and individuals.  In reality, these entities and individuals were merely holding the stock as nominees for Tobin, the true owner and control person.

3.      Patel, Ledvina, and Lacher arranged for Tobin's stock to be transferred to two offshore asset managers, including Wintercap SA ("Wintercap"), a Swiss company run by Roger Knox.  The accounts at the offshore asset managers were in the names of nominee entities— entities created to hold stock for Tobin—which further concealed Tobin's ownership and control. The offshore asset managers deposited the stock in omnibus securities accounts (accounts used to execute orders on behalf of asset managers' undisclosed clients, such as Tobin) at foreign and domestic brokerage firms, in blocks of shares, each of which constituted less than 5% of each company's outstanding shares.  The offshore asset managers, through the brokerage firms, then sold millions of dollars of shares of Tobin's stock to investors.

4.      To further preserve Tobin's anonymity, Ledvina and Lacher each served as purported "beneficial owners" of nominee accounts held at Wintercap, and also arranged for multiple other individuals to do so.  To establish these accounts for Tobin's nominees, Lacher and Ledvina each filled out account opening documents falsely claiming to be the beneficial

owners, and furnished personal information such as copies of their passports.  These deceptive steps were intended to conceal Tobin's involvement in the event that law enforcement authorities or regulators ever examined the records of Wintercap.

5.      Quinn was Tobin's partner in the scheme involving Environmental Packaging and planned to share in the proceeds of the sale of Tobin's Environmental Packaging stock.  Quinn's role in the scheme was to: (a) facilitate a reverse merger between the public company controlled by Tobin (then a "shell company" with no operations) and a private bulk-packaging company, the combination of which became Environmental Packaging; (b) arrange and oversee a $1 million promotional campaign designed to inflate the share price and trading volume of Environmental Packaging stock after the reverse merger; and (c) direct the offshore asset managers' selling of the Environmental Packaging stock in order to profit from the artificially-inflated demand for Environmental Packaging stock.

6.      Skriloff was the Chief Executive Officer ("CEO") of the private bulk-packaging company, and, after its merger with Tobin's public shell company, continued as the CEO of Environmental Packaging.  Skriloff negotiated the reverse merger with Quinn and Tobin, raised money from investors to pay $1 million for the promotional campaign, and attempted to disguise the payment as part of a purported consulting agreement.  As the CEO of Environmental Packaging, Skriloff made misstatements in public reports filed with the Commission about the reverse merger and about the company's connection to the promotional campaign.  Skriloff also failed to disclose material facts regarding Tobin, Quinn, and their scheme.

7.      Patel and Lacher helped Tobin and Quinn funnel the $1 million payment for the promotional campaign from Skriloff to the lead stock promoter.  In particular, Patel arranged for Wintercap to create an entity named Svarna Ltd. ("Svarna") for the purpose of misleading

investors and potential investors into believing that the promotional campaign was paid for by a third party—and not by Tobin or the company itself.  Lacher helped to open Svarna's account at Wintercap, and arranged for his girlfriend to pose as Svarna's purported beneficial owner.  The promotional campaign touted the stock of Environmental Packaging while falsely stating that the campaign had been paid for by Svarna.

8.      Tobin, Patel, Ledvina, and Lacher engaged in a similar scheme with respect to CURE, utilizing a network of nominee entities to secretly hold Tobin's shares, arranging for offshore asset managers to deposit those shares with brokers in blocks constituting less than 5% of CURE's outstanding shares, selling Tobin's shares to investors, and sharing in the profits.

9.      Tobin and his team failed to register their sales of either Environmental Packaging or CURE stock with the Commission.  Consequently, the sale and offer of those securities violated Sections 5(a) and (c) of the Securities Act of 1933, respectively.

10.     On June 27, 2017, the Commission suspended trading in the securities of Environmental Packaging.  After the Commission suspended trading, the defendants attempted further to conceal Tobin's control over Environmental Packaging and its stock and to obstruct the Commission's investigation.  For example, Patel, Ledvina, and Lacher arranged to change the names on certain accounts at Wintercap to the names of individuals not directly involved with the scheme.  Quinn and Skriloff each deleted incriminating emails to prevent their discovery, and Quinn provided false testimony to the Commission staff.

11.     As a result of the conduct alleged herein, Tobin, Patel, Quinn, Ledvina, and Lacher violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules

10b-5(a) and (c) thereunder [17 C.F.R. § 340.10b-5(a), (c)] and Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

12.     As a result of the conduct alleged herein, Skriloff violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 340.10b-5].  Skriloff also aided and abetted violations of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by the other defendants, and aided and abetted violations of Section 17(a)(2) of the Securities Act by Environmental Packaging.

13.     The Commission seeks a permanent injunction against the defendants, enjoining each from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], an order barring the defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and/or 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], an order barring Skriloff from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Massachusetts, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails.  For example, during the Relevant Period, promotional materials concerning Environmental Packaging were mailed to various individuals' residences in Massachusetts, and certain individuals who reside in Massachusetts purchased stock of Environmental Packaging and CURE.

## DEFENDANTS

16.     Morrie Tobin, ("Tobin"), age 56, is a resident of Los Angeles, California.

17.     Milan Patel, ("Patel"), age 49, is a resident of Miami, Florida.  Patel is a licensed attorney, and during the Relevant Period was a partner in the United States tax group of an international law firm headquartered in Zurich, Switzerland.

18.     Matthew Ledvina, ("Ledvina"), age 46, is a resident of Switzerland.  Ledvina is an attorney and colleague of Patel's at an international law firm headquartered in Zurich, Switzerland.

19.     Daniel Lacher, ("Lacher"), age 55, is a resident of Switzerland.  During the Relevant Period, Lacher operated a financial services company with a principal place of business in Volketswil, Switzerland.  Lacher provided services to undisclosed company insiders or control persons as an intermediary to foreign asset managers and brokers.

20.     Brian Quinn, ("Quinn"), age 48, is a resident of Newport Beach, California. During the Relevant Period, Quinn operated an investor relations company in Newport Beach

which, according to its website, "provides a wide variety of services for public companies that need results-oriented investor relations programs," and "assist[s] private companies with pre IPO services."

21.     David Skriloff, ("Skriloff"), age 53, is a resident of New York.  During the Relevant Period, Skriloff was the CEO of a private bulk-packaging company and then the CEO of Environmental Packaging after the reverse merger.

## RELATED PARTIES AND ENTITIES

22.     Environmental Packaging Technologies Holdings, Inc. ("Environmental Packaging") is a public company which was incorporated in Nevada in 2011.  Environmental Packaging initially was named GS Valet, Inc.  For several years, it purported to be a valet-parking business.  In or about October 2012, its stock began trading on OTC Markets.  During the same time period, the company began voluntarily filing quarterly, annual, and other periodic reports with the Commission following an initial public offering to sell stock to prospective investors.  In or around August 2013, Tobin acquired control of GS Valet, Inc., and subsequently arranged for its name to be changed to International Metals Streaming Corp. ("International Metals").  International Metals subsequently declared itself to be a shell company—a company with no or nominal operations or assets.  In or about 2017, International Metals merged with Environmental Packaging Technologies, Inc., a private company, and changed its name to Environmental Packaging.  Environmental Packaging continued to trade on OTC Markets under the ticker symbol EPTI and continued voluntarily to file periodic reports with the Commission.  According to reports filed with the Commission, Environmental Packaging is in the business of manufacturing "flexitanks" used to transport liquids in shipping containers.  After the Commission suspended trading in Environmental Packaging's stock in June 2017,

Environmental Packaging stock was traded on the so-called "Grey Market."  That is, its stock is available for purchase or sale by brokers acting on instructions initiated by their customers.

23.     <u>CURE Pharmaceutical Holding Corp.</u> ("CURE"), formerly known as Makkanotti Group Corp. ("Makkanotti"), is a public company which was incorporated in Nevada in May 2014.  In or about December 2015, Makkanotti began trading on OTC Markets.  During the same time period, Makkanotti began voluntarily filing periodic reports with the Commission following an initial public offering to sell stock to prospective investors.  In or about November 2016, Makkanotti merged with a private company named Cure Pharmaceutical Corporation and changed its name to CURE.  CURE continued to be available for trading on OTC Markets under the ticker CURR and continued voluntarily to file periodic reports with the Commission.  In March 2018, CURE registered its securities with the Commission, thereby requiring it to file periodic reports.  According to reports filed with the Commission, CURE is in the business of developing patents it holds for an oral drug delivery system.

24.     <u>Roger J. Knox</u>, ("Knox"), age 48, is a citizen of the United Kingdom and resident of France.  Knox is the founder and chief executive officer of Wintercap SA.

25.     <u>Wintercap SA</u>, ("Wintercap"), formerly known as <u>Silverton SA</u> ("Silverton"), is a Swiss entity that purports to be an asset manager.  Wintercap SA trades stock for its clients, who are company insiders or control persons, and sells that stock into the United States' securities market.  For consistency, the Complaint refers to Wintercap, although it was known as Silverton during much of the Relevant Period.

## **BACKGROUND**

26.      "Restricted stock" is stock of a publicly traded company (also known as an "issuer") that is acquired from an issuer, or an affiliate of the issuer, in a private transaction that

is not registered with the Commission.  Stock held by an issuer or affiliate of an issuer is restricted stock.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  A registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.  It also should disclose any person or group who is the beneficial owner of more than 5% of the company's securities.

27.     An "affiliate" of an issuer is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e. a control person).  "Control" means the power to direct management and policies of the company in question.  Typically, affiliates include officers, directors and controlling shareholders but any person who is "under common control" with an issuer may also be an affiliate.  Absent registration, affiliates are only permitted to sell a small percentage of their stock according to SEC Rule 144 [17 C.F.R. 230.144].

28.     "Unrestricted stock" is stock that may legally be offered and sold in the public marketplace by a non-affiliate, without registration or restriction, ordinarily having previously been subject to a registration statement filed with the Commission.  Registration statements are transaction specific; they apply to each separate offer and sale as detailed in the registration statement.  Registration does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  For example, if a control person buys shares in the company s/he controls, those shares are subject to restrictions and ordinarily require registration for bulk sales of such shares.

29.     A "transfer agent" is a business which, among other things, issues and cancels certificates of a company's stock to reflect changes in ownership.  Many companies that have publicly traded securities use transfer agents to keep track of the individuals and entities that own their stocks.

30.     The Over-The-Counter Securities Market ("OTC Markets") is an inter-dealer quotation and reporting service through which certain stocks are available for trading and are publicly purchased and sold through brokered orders.

## ENVIRONMENTAL PACKAGING

### Scheme to Conceal Tobin's Control and Stock Ownership

31.     In or about August 2013, Tobin acquired, directly or indirectly, undisclosed control of substantially all of the stock of GS Valet, Inc., the public company which would ultimately become Environmental Packaging.

32.     Tobin did not hold any shares of GS Valet, Inc., in his own name.  Instead, he used a nominee entity created for Tobin by Patel and Ledvina—MT Global Holdings—to hold a large block of restricted stock, and a group of friends and relatives to hold smaller blocks of purportedly unrestricted stock.  By using these nominees, Tobin concealed his ownership and control of GS Valet, Inc., stock.

33.     Tobin arranged for GS Valet, Inc., to change its name to International Metals in September 2013.  International Metals subsequently declared itself to be a shell company—a company with no or nominal operations or assets.  Prior to 2016, International Metals had little to no business operations.  Although International Metals had a CEO, the CEO took instructions from Tobin with respect to numerous corporate activities.

34.     Tobin, Patel, Ledvina, and Lacher planned to use Tobin's secret control over International Metals as part of a scheme to profit from illegal stock sales using a network of foreign and domestic nominee entities.  Lacher charged Tobin a fee of 1.5% of the group's trading proceeds for his involvement in the scheme.  Patel and Ledvina agreed with Tobin that they would be paid 4.5% of the group's net trading proceeds, after paying fees associated with offshore asset managers and other costs.

## Negotiation for Reverse Merger and Stock Promotion

35.     As part of the scheme, Tobin set out to find a private company that he could use to generate positive news, thereby increasing the value of International Metals' stock.

36.     In or around early 2016, Quinn introduced Tobin to Skriloff, the CEO of Environmental Packaging Technologies, Inc., a private bulk-packaging company that was a potential partner in their scheme.

37.     Quinn had a prior business relationship with the Chairman of the Board of Directors of Environmental Packaging Technologies, Inc., which Quinn understood to be seeking to raise capital by merging with a public company, such as the one controlled by Tobin.

38.     In exchange for Quinn's introduction to Skriloff and continued assistance, Tobin agreed to share half of his share of the trading proceeds with Quinn (after paying fees to Lacher, Patel, Ledvina, and offshore asset managers, as well as other costs of the scheme).  Together they planned to use Environmental Packaging Technologies, Inc., as an entity whose operations would provide the pretext for a promotional campaign aimed at raising the market value of Tobin's secret holdings of International Metals.  Tobin's stock could then be sold to investors for a profit using the network of nominee entities and accounts managed by Patel, Ledvina, and Lacher.  Because of their agreement, Tobin and Quinn communicated with each other about

Environmental Packaging stock as if it were jointly owned, though Tobin was the one who had

the ability to exercise control over the stock through Patel, Ledvina, Lacher, and their network of

nominees.

39.     During the remainder of 2016, Tobin and Quinn negotiated with Skriloff for

Environmental Packaging Technologies, Inc., to "reverse merge" into International Metals.

40.     In a reverse merger, a private company becomes a public company by purchasing

a public shell company.  Typically, the shareholders of the private operating company exchange

their shares for a large majority of the shares of the public company. Although the public shell

company survives the merger, the private operating company's shareholders gain a controlling

interest in the voting power and outstanding shares of stock of the public shell company.  The

assets and business operations of the post-merger surviving public company are primarily, if not

solely, those of the former private operating company.

41.     Skriloff knew that Tobin and Quinn secretly controlled International Metals, and

that they intended to retain substantially all of its purportedly unrestricted stock *after* the reverse

merger was complete so that they could promote the stock, artificially create demand, and then

illegally sell the stock to unsuspecting investors.

42.     Tobin, Quinn, and Skriloff initially agreed that Environmental Packaging

Technologies, Inc., would pay $1.5 million for International Metals, including $1 million which

would be spent on a stock promotion campaign.  A stock promotion campaign is typically an

effort by parties to generate interest in a company's stock among investors, often in an effort to

increase trading volume in the stock and/or boost the company's stock price.  Stock promotion

materials are usually disseminated to potential investors in a variety of ways, including by mass

emails or Internet-based newsletters.  Under the initial agreement, Tobin and Quinn would retain

approximately 12 million shares of purportedly unrestricted stock in International Metals, which was substantially all of its unrestricted stock.  International Metals would issue 40 million shares of restricted stock—that is, stock that could not yet be sold in the market—to the shareholders of Environmental Packaging Technologies, Inc.  International Metals would become Environmental Packaging and, in effect, the reverse merger would leave Tobin and Quinn secretly holding nearly all of the Environmental Packaging stock that could purportedly be sold in the U.S. market.

43.     Skriloff knowingly joined the scheme.  At the time he was negotiating the terms of the transaction, Skriloff understood that Tobin and Quinn would retain, and intended to sell, their 12 million shares of purportedly unrestricted stock.  In an email sent by Skriloff transmitting the executed term sheet for the reverse merger to Tobin, Quinn, and an attorney working on the reverse merger at Tobin's direction, Skriloff described the fact that the Tobin/Quinn "team" would be getting "$1.5 million and stock worth $4-5 million," that "parts of it need to go out" (referencing the funds to be spent on the stock promotion), and that they would "collectively become the largest shareholders as part of this."  During the negotiations, Skriloff also requested that Quinn and Tobin give two million of their purportedly unrestricted shares to Skriloff and another individual associated with the company, so that they could personally profit from the promotional campaign and illegal stock sales.

44.     Tobin, Quinn, and Skriloff also agreed to a financing deal related to the reverse merger, in which Environmental Packaging Technologies, Inc., would raise approximately $5 million from investors in a private offering in anticipation of the reverse merger, and would use $1 million of these funds to pay for the promotional campaign.

45.     To conceal their scheme, Tobin and Skriloff attempted to disguise the $1 million payment for promotional services as a fee for consulting services.  Accordingly, the draft merger agreement was modified to remove $1 million of the $1.5 million purchase price, and drafts of a purported consulting agreement for $1 million were exchanged.  In reality, the consulting agreement was a sham, and the only purpose of the $1 million payment was to finance the stock promotion campaign.

46.     In December 2016, International Metals publicly announced the reverse merger, and filed a Form 8-K (a form used to notify investors about significant events) with the Commission.  The Form 8-K described the agreement and attached a copy of the merger agreement.  The merger agreement, which was signed by Skriloff, reflected that Environmental Packaging Technologies, Inc., had agreed to pay $500,000 "to the shareholder of the controlling block" of stock in International Metals.  This was materiality false and misleading in that it concealed the fact that Skriloff had also agreed that Environmental Packaging Technologies, Inc., would pay an additional $1 million, to be used for the stock promotion desired by Tobin and Quinn as a condition of the merger.

**Preparations for Reverse Merger, Stock Promotion, and Stock Sales**

47.     The reverse merger between International Metals and Environmental Packaging Technologies, Inc. closed on or around June 9, 2017.  During the approximately six months between the announcement of the merger in December 2016 and the completion of the transaction in June 2017, Tobin, Patel, Ledvina, and Lacher worked to prepare to sell Tobin's shares during the stock promotion campaign.  This involved, among other things: (a) readying International Metals for the reverse merger; (b) transferring Tobin's stock from his friends and relatives to nominee entities (the "Environmental Packaging Nominees") that would appear to be

unconnected to Tobin; (c) opening accounts at Wintercap and another offshore asset manager in the names of the Environmental Packaging Nominees; and (d) arranging for these asset managers to deposit Tobin's Environmental Packaging shares with brokers in small blocks, each constituting just under 5% of Environmental Packaging's outstanding shares, in order to conceal the fact that one individual or group (here, Tobin and his team) controlled more than 5% of Environmental Packaging's outstanding shares and substantially all of its purportedly unrestricted shares.

48.     Tobin and Patel used Tobin's control over International Metals to prepare it for the reverse merger. The private company, Environmental Packaging Technologies, Inc., was supposed to pay a certain amount ($500,000, later adjusted to $550,000) in exchange for Tobin "cancelling" the large block of restricted shares of International Metals which had been held for Tobin by MT Global since 2013.

49.     In December 2016, Tobin, Patel, and Lacher arranged for MT Global to transfer its block of restricted shares to Sundrive Holdings Corp. ("Sundrive"), an entity incorporated in the Caribbean island of Nevis by an offshore asset manager as arranged by Lacher, Patel, and Ledvina. This created the false appearance that International Metals was controlled by Sundrive, an entity with no apparent connection to Tobin.

50.     In February 2017, Tobin and Patel arranged for International Metals to change its name to Environmental Packaging in anticipation of the completed merger. To do this, Patel signed an authorization for the name change on behalf of Sundrive, at Tobin's direction.

51.     Tobin, Patel, Quinn, Ledvina, and Lacher planned to sell the purportedly unrestricted shares that had been held for Tobin by friends and relatives since 2013. As they each knew, or recklessly disregarded, these shares were restricted from resale without

registration because Tobin was an affiliate of Environmental Packaging who owned substantially all its stock.  They further knew, or recklessly disregarded, that because the shares falsely appeared to be unrestricted, a broker was likely to accept a deposit of the shares and sell them to investors without further inquiry as to a possible exemption from registration and without limiting the amount of shares that could be sold in accordance with SEC Rule 144.

52.     Starting in or around January 2017, Patel coordinated with Tobin and others to transfer Environmental Packaging stock from Tobin's relatives and friends to the Environmental Packaging Nominees.

53.     Patel signed phony stock purchase agreements reciting amounts of consideration that had purportedly been paid by the Environmental Packaging Nominees to Tobin's relatives and friends.  In reality, the Environmental Packaging Nominees never paid for the stock and Tobin was, and remained, the true beneficial owner of the stock.  For example, Patel signed a stock purchase agreement dated January 20, 2017, on behalf of an Environmental Packaging Nominee purporting to purchase 359,316 shares of Environmental Packaging stock from Tobin's brother-in-law for $359.32.  In reality, even that nominal payment was not made.

54.     After Tobin's stock in Environmental Packaging had been transferred to the Environmental Packaging Nominees, Patel, Ledvina, and Lacher arranged to open several accounts on Tobin's behalf with Wintercap, with each account in the name of one of the Environmental Packaging Nominees.  On January 12, 2017, Patel, Ledvina, and Lacher met in person with Knox in Switzerland to arrange to open the accounts.  To avoid direct association with the stock sales, Ledvina, Lacher, and a colleague at Patel's and Ledvina's law firm posed as the supposed beneficial owners of one of these accounts instead of Tobin.  Wintercap kept track

of these "beneficial owners" on a Swiss regulatory form called "Form A" that asset managers are required to maintain to track beneficial ownership of assets.

55.     Patel and Lacher then facilitated the transfer of Tobin's stock to the accounts held by Wintercap and to one account at another asset manager.  For each of these transfers, Patel signed transfer agent instruction forms, which caused the stock to be transferred to the offshore asset managers.  For example, Patel signed two transfer instruction forms dated March 27, 2017, to instruct the transfer agent to transfer stock certificates from two Environmental Packaging Nominees to Wintercap.  Lacher sent transfer instruction forms signed by Patel to the transfer agent, and arranged for payment to the transfer agent for the costs of the transactions.

56.     Knox and Wintercap deposited Tobin's shares of Environmental Packaging with multiple brokers in order to sell the shares in the U.S. securities market.  The deposits to brokers were all in amounts constituting less than 5% of Environmental Packaging's outstanding shares, so as to conceal the fact that these shares were all owned and controlled by an individual or group that was an affiliate of Environmental Packaging.  The use of the offshore asset managers' accounts added another layer of concealment concerning Tobin's ownership of the stock because the stock was deposited into omnibus brokerage accounts (i.e., accounts that do not identify specific beneficial ownership information) at foreign and domestic brokerage firms.

57.     Immediately prior to the completion of the reverse merger between Environmental Packaging and the private company, Tobin controlled substantially all of Environmental Packaging's stock, while concealing his ownership through multiple nominees and false representations about beneficial ownership.

58.     By using a network of nominees, accounts at offshore asset managers in the names of those nominees, and omnibus accounts at brokers in the names of the asset managers,

Tobin, Patel, Ledvina, and Lacher, hid Tobin's control over Environmental Packaging's stock, thereby creating the false appearance that no single Environmental Packaging Nominee or Tobin owned more than 5% of the company's stock.  This façade enabled the defendants to evade SEC rules that required Environmental Packaging to list all persons holding greater than 5% of its outstanding stock in reports filed with the Commission.

### Stock Promotion Efforts to Sell Tobin's Environmental Packaging Stock

59.     As agreed with Tobin and Quinn, Skriloff solicited investments in anticipation of the merger of Environmental Packaging and the private company in order to finance the stock promotion campaign for Environmental Packaging in support of Tobin's unregistered sale of millions of shares of his stock.  Unbeknownst to those investors, Tobin, Quinn, and Skriloff had agreed that $1 million of the funds raised from investors would be used to pay for a promotional campaign targeting investors and potential investors in Environmental Packaging.

60.     To that end, in anticipation of the reverse merger, Tobin and Quinn hired a company (the "Stock Promoter") to lead a promotional campaign carefully timed to coincide with the announcement of the completion of the reverse merger in June 2017.  The Stock Promoter's role was to target potential investors with a mass mail and mass email promotional campaign designed to create interest in Environmental Packaging stock.  The Stock Promoter also referred Quinn to a writer whom Tobin and Quinn hired to draft the creative content for the promotion, which Quinn and Tobin reviewed and edited.

61.     Skriloff provided Tobin and Quinn with a detailed PowerPoint presentation about Environmental Packaging Technologies, Inc., an executive summary, and a spreadsheet of financial projections, with the understanding that Tobin and Quinn would use these materials for

the stock promotion campaign.  Quinn sent the presentation to the Stock Promoter and to the writer, and the writer used these materials to author the creative content for the promotion.

62.     Although Quinn knew that the stock promotion would be paid for by Environmental Packaging, as directed by Tobin and Quinn, Quinn falsely informed the Stock Promoter that a third party named "Svarna" was paying for the stock promotion.

63.     The defendants knew, or were reckless in not knowing, that the Stock Promoter would disclose to the investing public the name of the party that was purportedly paying for the promotion and that such disclosures would be misleading absent a disclosure that the promotion was being underwritten by controlling affiliates of Environmental Packaging.

64.     In order to deceive investors about Tobin's connection with Environmental Packaging and the stock promotion, Patel asked Wintercap to create an offshore nominee account through which to funnel payment for the promotional campaign.

65.     On or about May 19, 2017, Lacher emailed Patel an invoice for $1 million from the Stock Promoter, billed to "Svarna, LLC," along with wiring instructions.  That same day, Patel wrote an email to Knox which states, in relevant part: "[w]e need to form an entity with the name Svarna LLC . . . ."  Patel also wrote that his team would provide the name of an individual that could be named as the "beneficial owner" of Svarna LLC.  Patel also stated in this email that, in sum and substance, the Svarna entity would be used as a conduit to pay the Stock Promoter.

66.     On or about May 22, 2017, Knox emailed the following to Patel: "[a]s discussed, the amended Marshall Island company named Svarna Ltd is available and incorporation has been requested today."  Patel and Lacher arranged for Lacher's girlfriend to serve as the purported

"beneficial owner" of Svarna, and provided Wintercap with a curriculum vitae, a copy of her

passport, and a signed "Form A" which represented that she was the beneficial owner of Svarna.

67.     On or about May 20 through May 25, 2017, Tobin and Skriloff caused the transfer

of a total of approximately $1 million from Environmental Packaging to Svarna's account at

Wintercap.  On or about May 24 through June 1, 2017, Tobin, Quinn, Patel, and Lacher arranged

for these funds to be transferred from Svarna's account to the Stock Promoter for the purpose of

promoting Environmental Packaging and its stock.

68.     On or about June 12, 2017, the Stock Promoter began disseminating marketing

and promotional materials concerning Environmental Packaging.  These materials included a 16-

page glossy mailer that was sent by U.S. mail to thousands of investors across the United States.

The mailer touted the stock of Environmental Packaging with statements such as,

"Environmental Packaging . . . Could be Perfectly Positioned To Put Up To 1,118% In Your

Pocket!"  As planned, the Stock Promoter listed "Svarna" as the paying "third party" in its

disclosures to investors.

69.     Tobin exercised control over Environmental Packaging and Skriloff during the

promotional campaign.  At Tobin's direction, Skriloff caused Environmental Packaging to issue

press releases touting positive news about Environmental Packaging.  For example, on June 23,

2017, Tobin emailed Skriloff a draft press release announcing that Environmental Packaging was

expanding the capacity of its manufacturing facility due to increased customer demand.  Tobin

wrote in an email to Skriloff, "Attached is the press release to go out before the market opens . . .

. please confirm this is going out before the open."  Skriloff followed Tobin's instruction and

Environmental Packaging issued the press release that day.  Tobin and Quinn coordinated the

timing of Environmental Packaging's press releases to dovetail with the dissemination of emails in the stock promotion.

### Misstatements by Environmental Packaging

70.     Skriloff also contributed to the scheme by making misstatements and misleading omissions, in the company's filings with the Commission or otherwise to investors, as the CEO of Environmental Packaging.  For example, in Form 8-Ks filed with the Commission on June 12, 2017, and June 21, 2017, and signed by Skriloff, Environmental Packaging made multiple misstatements and omissions, including:

a.     Omitting to state that Tobin was the beneficial owner of nearly 20% of Environmental Packaging's outstanding shares (following the issuance of more than 40 million new shares as part of the reverse merger) and that Tobin controlled substantially <u>all</u> of the company's unrestricted shares;

b.     Falsely describing the terms of the merger, specifically by stating that the public shell's "majority shareholder" was to be paid $550,000, when, in reality, Skriloff had agreed with Tobin and Quinn to pay $1.5 million, which included the $1 million payment for the stock promotion; and

c.     Omitting to state that the company had paid $1 million for the stock promotion designed to increase demand, in order to sell Tobin's shares.

71.     Skriloff obtained money for Environmental Packaging from investors using these misstatements and misleading omissions.  For example, just days after Skriloff signed Environmental Packaging's false Form 8-K dated June 21, 2017, two individuals invested an aggregate of $120,000 with Environmental Packaging.

**Illegal Stock Sales**

72.     Prior to the promotional campaign, there was virtually no public trading of Environmental Packaging's stock.  The average daily trading volume of Environmental Packaging's stock during the period from May 1, 2017, through June 9, 2017 (a Friday), was less than 23,000 shares per day, and on most days during that period of time, Environmental Packaging's stock did not trade at all in the public securities markets.  But, on or about June 12, 2017, the first day of the paid promotional campaign, approximately 424,956 shares of Environmental Packaging traded in the public securities markets, of which approximately 224,000 shares were Tobin's stock, sold by Wintercap and a second offshore asset manager.

73.     Quinn directed the trading on behalf of the group by telling Tobin how many shares of Environmental Packaging to sell and at what price.  Tobin passed these instructions to Lacher, who in turn instructed the offshore asset managers.

74.     On or about June 13, 2017, approximately 226,263 shares of Environmental Packaging traded in the public securities market, of which approximately 66,000 shares were Tobin's stock, sold by Wintercap.

75.     Thereafter, the offshore asset managers continued to sell Tobin's Environmental Packaging stock.  Between June 14 and 27, 2017, the offshore asset managers dumped approximately 735,000 additional shares of Environmental Packaging stock into the public securities markets to investors.  Collectively, Tobin's sales of Environmental Packaging stock in June 2017 generated approximately $1.5 million in trading proceeds.  Lacher received trading and account records from the offshore asset managers and prepared spreadsheets which aggregated the activity of the several Environmental Packaging Nominee accounts in order to track all of the selling of Tobin's shares through the various nominee accounts.

76.     By virtue of the scheme perpetrated by the defendants, the sales of Tobin's stock were presented and processed as if they were ordinary market purchases of a widely-traded stock.  In reality, the purchasers were buying the stock of a company insider who was illegally and secretly dumping his shares.

77.     The defendants failed to register these stock sales pursuant to Section 5 of the Securities Act.  Tobin's Environmental Packaging stock was, by law, restricted from resale because Tobin was an affiliate of Environmental Packaging.  The sales of Tobin's Environmental Packaging stock also failed to meet the conditions of SEC Rule 144.

## **Attempts to Cover-Up the Fraud**

78.     Starting in or about August 2017, the Commission staff issued investigative subpoenas for documents concerning Environmental Packaging and the above-mentioned conduct to a number of individuals and entities, including Tobin, Environmental Packaging, and Quinn's company.

79.     Tobin discussed the Commission's investigation with the other defendants, and they coordinated efforts to conceal the Environmental Packaging scheme and to thwart and obstruct the Commission's investigation.  In particular, Tobin, Patel, Ledvina, and Lacher became concerned that the purported beneficial owners listed on paperwork (including Form As) for the Environmental Packaging Nominees were too closely connected to them and that the Commission would be able to figure out that Tobin and his group were really in control of the Environmental Packaging stock held by the Environmental Packaging Nominees.

80.     In or about September 2017, Patel and Ledvina met in Switzerland with Knox and another Wintercap representative to discuss their group's concern.  Knox advised them that they should change the names of the purported beneficial owners on the Form As and should use the

names of people who were not so obviously connected to their group.  Knox further advised them that the Form As should be changed before December 2017 because a Swiss regulator was scheduled to audit Wintercap's records at that time.

81.     Prior to December 2017, Ledvina sought out two new names to list as beneficial owners—individuals from Dubai and Switzerland—to take the place of Ledvina and his law firm colleague.  Ledvina obtained and submitted to Wintercap the documents necessary to accomplish this, including false Form As and backdated "know-your-client" letters in which Ledvina falsely represented that these individuals were each the "sole (100%) beneficial owner" of their respective Environmental Packaging Nominee.

82.     Tobin agreed to pay approximately $60,000 of the Environmental Packaging trading proceeds to each of Patel, Ledvina, and Lacher in exchange for their help in concealing the fraud.  Lacher agreed with Tobin to keep his designation as the purported beneficial owner of one of the Environmental Packaging Nominee accounts at Wintercap, and to be the "target" if the account was discovered during the investigation.

83.     To obstruct the Commission's investigation and conceal their roles in the scheme, Quinn and Skriloff deleted incriminating emails concerning the Environmental Packaging deal.  Quinn deleted from his email account all electronic communications concerning Environmental Packaging.  Skriloff deleted from his email account all of his electronic communications with Quinn.

84.     Tobin, Patel, and Skriloff attempted to conceal the source of the $1 million payment for the promotional campaign by: (a) raising another $1 million from new investors by selling them some of Tobin's shares in private transactions and (b) using those funds to refund the $1 million to Environmental Packaging under the guise of a cancelled consulting agreement.

To support this ruse, Skriloff emailed an attorney whose firm was to receive the funds from the new investors and stated, "It is my understanding that the consultant will be returning the payment as nothing ever got signed.  I think it will be coming in a few different wires.  Let me know when they arrive."  In reality, there was never any consultant, the $1 million purportedly paid to the "consultant" had actually been spent on the promotion, and the money being "refunded" was actually money that had been newly raised from investors through stock sales.

85.     In telephone conversations with a cooperating witness ("CW1"), Skriloff stated, in sum and substance:  (a) that Skriloff knew Quinn and Tobin controlled substantially all of Environmental Packaging's purportedly unrestricted shares after the reverse merger; (b) that Skriloff had provided Quinn with information about the company to use in the stock promotion; (c) that the "refund" scheme described above was intended to replace the $1 million for the promotional campaign; (d) and that Skriloff deleted all of his emails with Quinn.  Skriloff also discussed with CW1 the status of the Commission's investigation and what CW1 should say to Commission staff, including various falsehoods.

86.     In March 2018, Environmental Packaging filed belated Form 10-Qs (a quarterly report that public companies are generally required to file with the Commission after the end of each quarter) for the quarters ended June 30, 2017 and September 30, 2017.  These were signed by Skriloff, and falsely stated that the company "had no prior knowledge and did not participate in the preparation and/or distribution of" the promotional material.  These forms also omitted to disclose various material facts about the scheme and about the role of Tobin's group.

87.     Quinn testified under oath to the Commission staff in May 2018 and made numerous false statements concerning Tobin and the Environmental Packaging scheme.  For example, Quinn testified that he did not own or expect to receive any shares of Environmental

Packaging, and that he did not expect to profit from the sale of anyone else's shares of Environmental Packaging.   In reality, Quinn and Tobin had agreed to share the proceeds of the sale of Tobin's Environmental Packaging shares, and those proceeds were held for their benefit in the Environmental Packaging Nominee accounts at the offshore asset managers.   In telephone conversations with CW1 between March 2018 and June 2018, Quinn repeatedly asked CW1 when he would be able to get his share of the trading proceeds.   In those telephone conversations, Quinn and CW1 specifically discussed that the shares were held in various nominee accounts and that Patel was the intermediary between Tobin and Wintercap.   During an in-person meeting with CW1, Quinn also informed CW1 that Quinn had lied during his testimony before the Commission staff, and discussed the need to keep their stories straight.

## CURE

### Scheme to Conceal Tobin's Control and Sales of CURE Stock

88.     Defendants Tobin, Patel, Ledvina, and Lacher engaged in a substantially similar scheme with respect to the stock of CURE.  As with Environmental Packaging, Tobin, Patel, Lacher, and Ledvina sought to sell Tobin's shares of CURE: (a) without registering the offer or sale of stock with the Commission; (b) without disclosing accurate information about Tobin's ownership and control over CURE; and (c) without complying with limitations on the sale of stock by company "affiliates" such as Tobin.

89.     In or about June 2016, Tobin entered into an agreement to acquire, directly or indirectly, undisclosed control of substantially all of the stock of a public company, Makkanotti, by purchasing: (a) a large block of restricted stock, and (b) a significant percentage of the stock that had been trading as unrestricted shares.

90.     Between June 2016 and November 2016, Tobin exercised his control over Makkanotti by installing a new CEO, and arranging for Makkanotti's reverse merger with a private drug-delivery company.  Following the reverse merger, Makkanotti changed its name to CURE.  As of September 30, 2016, immediately prior to the merger, Tobin controlled approximately 95% of CURE's stock; consequently, Tobin was an affiliate of CURE.

91.     In order to hide Tobin's control over CURE, Tobin, Patel, Ledvina, and Lacher: (a) arranged for the restricted stock to be held by a nominee created and controlled by Patel, Lacher, and Ledvina, and (b) arranged for the majority of Tobin's holdings in previously unrestricted stock to be held on his behalf by a series of offshore corporations and accounts created by Patel, Lacher, and Ledvina (the "CURE Nominees").

92.     Patel, Lacher, and Ledvina knew, or were reckless in not knowing, that the entity used by Tobin to hold his block of restricted shares, Aureus Fiduciary Nevis Limited ("Aureus Fiduciary"), was designed to conceal Tobin's control of CURE in order to facilitate his illegal sale of shares that he held as a control person.  For example, Patel signed a document, dated November 7, 2016, on behalf of Aureus Fiduciary (as its purported controlling shareholder) that approved the terms of the merger and the public company's name change following the merger. In reality, and as Patel knew, Tobin, operating through Aureus Fiduciary, was calling the shots and directed the merger and name change.

93.     Tobin, working with Patel, Lacher, and Ledvina, hid his control over CURE's purportedly unrestricted stock by using the CURE Nominees, and treated the CURE stock held by the CURE Nominees as if the stock was unrestricted.  In reality, as Patel, Ledvina, and Lacher knew or recklessly disregarded, this CURE stock was restricted because it was owned by Tobin, who was an affiliate of the issuer and controlled the issuer through financing and through his

substantial ownership interest.  The use of multiple CURE Nominees hid Tobin's control over

CURE's stock to make it appear that no single CURE Nominee or Tobin controlled more than

5% of the company's stock.  This façade enabled Tobin to evade SEC rules that required CURE

to disclose all persons holding greater than 5% of its outstanding stock in reports filed with the

Commission.

94.     Patel and Ledvina created another corporation named Aureus Financial Holdings

LLC ("Aureus Financial"), with an address of record located at Patel's then residence in Short

Hills, New Jersey.  Patel and Ledvina then used Aureus Financial to directly invest in the CURE

scheme, on their own behalf, by purchasing 300,000 shares of stock from Tobin for $300,000.

95.     Patel's and Ledvina's CURE stock was subject to sale restrictions because they,

like Tobin, were affiliates of CURE.  By working on behalf of Tobin as his agents and by

scheming with Tobin to illegally sell stock, Patel and Ledvina were affiliates in light of Tobin's

control of CURE.  Thus Patel and Ledvina's CURE stock was subject to Rule 144's restrictions

on the amount of stock of CURE they could sell without registration.

96.     By November 2016, following the merger, Tobin, Patel, and Ledvina controlled

approximately 6.8 million shares of CURE (29% of the company), of which approximately 4

million shares (the vast majority of CURE's purportedly unrestricted stock) were held by the

CURE Nominees.

97.     In or around February and March 2017, Patel, Ledvina, and Lacher facilitated the

transfer of Tobin's CURE stock from the CURE Nominees to accounts at Wintercap and another

offshore asset manager.  These transfers added another layer of concealment of Tobin's

ownership of the stock because the offshore asset managers could deposit Tobin's stock into

omnibus brokerage accounts at foreign and domestic brokerage firms.

98.     For each transfer, Patel signed transfer instruction forms which caused the stock to be transferred from the CURE Nominees to the offshore asset manager.  For example, Patel signed three transfer instruction forms dated February 10, 2017 to instruct the transfer agent to transfer CURE stock from three CURE Nominees to Wintercap.

99.     Ledvina, Lacher, and a relative of Lacher each posed as a purported beneficial owner of one of the CURE Nominees' accounts at Wintercap.  Patel sent Wintercap letters falsely declaring that each was "the sole (100%) beneficial owner" of their respective CURE Nominee.  Ledvina and Lacher then each sent Wintercap signed Form As in which they falsely declared themselves to be the beneficial owners of their respective CURE Nominees, and Lacher also sent Wintercap a false Form A purportedly signed by the relative of Lacher.

100.     Between February and March 2017, Wintercap and a second offshore asset manager placed large orders to sell Tobin's CURE stock (held in the name of the CURE Nominees).  At or about the same time, CURE issued approximately eight press releases, and Tobin's group paid to market the company through online advertising.  During this time period, there was a price and daily trading volume spike of CURE's stock.  Between February 27, 2017, and March 31, 2017, the volume of trading in CURE stock increased from approximately 4,500 shares per day to an average of approximately 36,000 shares per day, and the price rose from approximately $2-$3 per share to a high of $15 per share.  Tobin sold approximately 466,000 shares of CURE stock through the two offshore asset managers, realizing trading proceeds of approximately $2.1 million.  Tobin agreed with Patel and Ledvina to treat 300,000 of the 466,000 shares sold as belonging to Patel and Ledvina, because the shares held by Patel's and Ledvina's nominee (Aureus Financial) had not been deposited with a broker.

101.    Tobin, Patel, Ledvina, and Lacher failed to register these stock sales pursuant to Section 5 of the Securities Act.  By law, Tobin's CURE stock was restricted from resale because Tobin was an affiliate of CURE.  The sales of Tobin's CURE stock also failed to meet the conditions of SEC Rule 144.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
**(Violations of Sections 17(a)(1) and (3) of the Securities Act)**
**(All Defendants — Environmental Packaging)**

102.    Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

103.    During the Relevant Period, the stock of Environmental Packaging were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

104.    By reason of the conduct described above, the defendants, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge, state of mind or negligence (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

105.    By reason of the conduct described above, the defendants each violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**(Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder)**
**(All Defendants — Environmental Packaging)**

106.    Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

107.    During the Relevant Period, the stock of Environmental Packaging were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

108.    By reason of the conduct described above, the defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

109.    By reason of the conduct described above, the defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## THIRD CLAIM FOR RELIEF
## UNREGISTERED OFFERINGS OF SECURITIES
**(Violations of Sections 5(a) and 5(c) of the Securities Act)**
**(Tobin, Patel, Quinn, Ledvina, and Lacher — Environmental Packaging)**

110.    Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

111.    During the Relevant Period, the stock of Environmental Packaging were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

112.     By reason of the conduct described above, Tobin, Patel, Quinn, Ledvina, and

Lacher, directly or indirectly:  (a) made use of the means or instruments of transportation or

communication in interstate commerce or of the mails to sell, through the use or medium of a

prospectus or otherwise, securities as to which no registration statement has been in effect and

for which no exemption from registration has been available; and/or (b) made use of the means

or instruments of transportation or communication in interstate commerce or of the mails to offer

to sell, through the use or medium of a prospectus or otherwise, securities as to which no

registration statement has been filed and for which no exemption from registration has been

available.

113.     As a result, Tobin, Patel, Quinn, Ledvina, and Lacher violated Sections 5(a) and

(c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

### FOURTH CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### (Violations of Section 17(a)(2) of the Securities Act)
#### (Skriloff — Environmental Packaging)

114.     Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if

fully set forth herein.

115.     During the Relevant Period, the stock of Environmental Packaging were securities

under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

116.     By reason of the conduct described above, Skriloff, in connection with the offer

or sale of securities of Environmental Packaging, by the use of the means or instrumentalities of

interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of

knowledge, state of mind or negligence, obtained money or property by means of untrue

statements of material fact or by omissions to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

117.     By reason of the conduct described above, Skriloff violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

## FIFTH CLAIM FOR RELIEF
## <u>FRAUD IN THE OFFER OR SALE OF SECURITIES</u>
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder)
### (Skriloff — Environmental Packaging)

118.     Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

119.     During the Relevant Period, the stock of Environmental Packaging were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

120.     By reason of the conduct described above, Skriloff, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

121.     By reason of the conduct described above, Skriloff violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

## SIXTH CLAIM FOR RELIEF
## <u>AIDING AND ABETTING</u>
### (Violations of Section 20(e) of the Exchange Act)
### (Skriloff — Environmental Packaging)

122.     Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

123.     During the Relevant Period, the stock of Environmental Packaging were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

124.    By reason of the conduct described above, Defendants Tobin, Patel, Quinn,

Ledvina, and Lacher directly or indirectly, in connection with the purchase or sale of securities

of Environmental Packaging, by the use of the means or instrumentalities of interstate commerce

or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or

recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts,

practices, or courses of business which operated or would operate as a fraud or deceit upon any

persons, including purchasers or sellers of the securities.

125.    Skriloff knowingly or recklessly provided substantial assistance to Defendants

Tobin, Patel, Quinn, Ledvina, and Lacher, in their violation of Section 10(b) of the Exchange Act

and Rules 10b-5(a) and (c) thereunder.

126.    As a result, Skriloff violated Section 20(e) of the Exchange Act [15 U.S.C. §

78t(e).]

## SEVENTH CLAIM FOR RELIEF
## AIDING AND ABETTING
**(Violations of Section 15(b) of the Securities Act)**
**(Skriloff — Environmental Packaging)**

127.    Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if

fully set forth herein.

128.    During the Relevant Period, the stock of Environmental Packaging were securities

under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

129.    By reason of the conduct described above, Defendants Tobin, Patel, Quinn,

Ledvina, and Lacher in connection with the offer or sale of securities, by the use of the means or

instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the

requisite degree of knowledge, state of mind or negligence (i) employed devices, schemes, or

artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which

operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

130.     Skriloff knowingly or recklessly provided substantial assistance to Defendants Tobin, Patel, Quinn, Ledvina, and Lacher, in their violation of Sections 17(a)(1) and (3) of the Securities Act.

131.     As a result, Skriloff violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

**EIGHTH CLAIM FOR RELIEF**
**AIDING AND ABETTING**
**(Violations of Section 15(b) of the Securities Act)**
**(Skriloff — Environmental Packaging)**

132.     Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

133.     During the Relevant Period, the stock of Environmental Packaging were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

134.     By reason of the conduct described above, Environmental Packaging, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with requisite degree of knowledge, state of mind or negligence obtained money or property by means of untrue statements of material fact or by omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135.     Skriloff knowingly or recklessly provided substantial assistance to Environmental Packaging in its violation of Section 17(a)(2) of the Securities Act.

136.     As a result, Skriloff violated Section 15(b) of the Securities Act [15 U.S.C. §§ 77o(b)].

## NINTH CLAIM FOR RELIEF
## FRAUD IN THE OFFER OR SALE OF SECURITIES
### (Violations of Sections 17(a)(1) and (3) of the Securities Act)
### (Tobin, Patel, Ledvina, and Lacher — CURE)

137.    Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

138.    During the Relevant Period, the stock of CURE were securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

139.    By reason of the conduct described above, defendants Tobin, Patel, Ledvina, and Lacher, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting with the requisite degree of knowledge, state of mind or negligence (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

140.    By reason of the conduct described above, Tobin, Patel, Ledvina, and Lacher each violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. § 77q(a)(1) and (3)].

## TENTH CLAIM FOR RELIEF
## FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
### (Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder)
### (Tobin, Patel, Ledvina, and Lacher — CURE)

141.    Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if fully set forth herein.

142.    During the Relevant Period, the stock of CURE were securities under Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

143.    By reason of the conduct described above, defendants Tobin, Patel, Ledvina, and

Lacher, directly or indirectly, in connection with the purchase or sale of securities, by the use of

the means or instrumentalities of interstate commerce or of the mails, or of any facility of any

national securities exchange, intentionally, knowingly or recklessly, (i) employed devices,

schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which

operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers

of the securities.

144.    By reason of the conduct described above, Tobin, Patel, Ledvina, and Lacher

violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R.

§ 240.10b-5(a) and (c)] thereunder.

## ELEVENTH CLAIM FOR RELIEF
## UNREGISTERED OFFERINGS OF SECURITIES
### (Violations of Sections 5(a) and 5(c) of the Securities Act)
### (Tobin, Patel, Ledvina, and Lacher — CURE)

145.    Paragraphs 1 through 101 above are re-alleged and incorporated by reference as if

fully set forth herein.

146.    During the Relevant Period, the stock of CURE were securities under Section

2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)].

147.    By reason of the conduct described above, defendants Tobin, Patel, Ledvina, and

Lacher, directly or indirectly:  (a) made use of the means or instruments of transportation or

communication in interstate commerce or of the mails to sell, through the use or medium of a

prospectus or otherwise, securities as to which no registration statement has been in effect and

for which no exemption from registration has been available; and/or (b) made use of the means

or instruments of transportation or communication in interstate commerce or of the mails to offer

to sell, through the use or medium of a prospectus or otherwise, securities as to which no

registration statement has been filed and for which no exemption from registration has been available.

148.    As a result, Tobin, Patel, Ledvina, and Lacher violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.      Enter a permanent injunction restraining each of the defendants, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. 240.10b-5(a) and (c)].

B.       Enter a permanent injunction restraining each of Tobin, Quinn, Patel, Ledvina, and Lacher, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), (c)].

C.      Enter a permanent injunction restraining Skriloff, his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(b) thereunder [17 C.F.R. 240.10b-5(b)].

D.      Order the defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

E.      Order the defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

F.      Enter an order barring the defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

G.      Impose an officer and director bar against Skriloff pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

H.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

I.      Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED this 29th day of August 2019.

Respectfully submitted,

/s/ David M. Scheffler
David M. Scheffler (Mass Bar No.670324)
Eric A. Forni (Mass Bar No. 669685)
J. Lauchlan Wash (Mass Bar No. 629092)
Kathleen B. Shields (Mass Bar No. 637438)
Amy Gwiazda (Mass Bar No.663494)
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch St., 24th Floor
Boston, MA 02110

Phone: (617) 573-8810 (Scheffler direct)
Fax: (617) 573-4590 (fax)
schefflerd@sec.gov (Scheffler email)